1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VICTOR BARRAGAN,

11              Petitioner,                No. 2: 09-cv-2584 KJM KJN P

12        vs.

13   HEDGPETH, Warden,

14              Respondent.               FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2005 conviction for:  (1)

19   murder with the special circumstances of felony murder/attempted robbery and felony

20   murder/attempted burglary (Cal. Penal Code §§ 187, 190.2(a)(17)(A) and (G)), with an

21   enhancement for the intentional discharge of a firearm (Cal. Penal Code § 12022.53(d) and

22   (e)(1)); (2) burglary with personal use of a firearm (Cal. Penal Code §§ 459, 12022.5(a)); (3)

23   attempted home invasion robbery with enhancements for the intentional discharge of a firearm

24   and committing the crime for the benefit of a criminal street gang (Cal. Penal Code §§ 664/211,

25   12022.53(d) and (e)(1), 186.22(b)(1)); and 4) being a felon in possession of a firearm (Cal. Penal

26   Code § 12021(a)).

1

Petitioner is serving a sentence of life without the possibility of parole for murder with special circumstances, plus 25 years to life for the firearm discharge enhancement, plus 10 years for the criminal street gang enhancement, all consecutive to a three year determinate term for being a felon in possession of a firearm.

This action is proceeding on the original petition filed September 16, 2009. Petitioner raises four claims: 1) violation of right to self-representation; 2) violation of the Confrontation Clause; 3) improper admission of prior crimes; and 4) jury instruction error.

After carefully reviewing the record, the undersigned recommends that the petition be denied.

II.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

2

1  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

2  (2000)).

3        Under the  "unreasonable application" clause of section 2254(d)(1), a federal

4  habeas court may grant the writ if the state court identifies the correct governing legal principle

5  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

6  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

7  simply because that court concludes in its independent judgment that the relevant state-court

8  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

9  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

10 (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its

11 independent review of the legal question, is left with a 'firm conviction' that the state court was

12 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas

13 relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

14 decision."  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

15       The court looks to the last reasoned state court decision as the basis for the state

16 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

17 decision, "and the state court has denied relief, it may be presumed that the state court

18 adjudicated the claim on the merits in the absence of any indication or state-law procedural

19 principles to the contrary."  Harrington, 131 S. Ct. at 784-85 (2011).  That presumption may be

20 overcome by a showing that "there is reason to think some other explanation for the state court's

21 decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

22       Where the state court reaches a decision on the merits but provides no reasoning

23 to support its conclusion, the federal court conducts an independent review of the record.

24 "Independent review of the record is not de novo review of the constitutional issue, but rather,

25 the only method by which we can determine whether a silent state court decision is objectively

26 unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

1   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

2   basis for the state court to deny relief. Harrington, 131 S. Ct. at 784. "[A] habeas court must

3   determine what arguments or theories supported or, . . . could have supported, the state court's

4   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

5   arguments or theories are inconsistent with the holding in a prior decision of this Court. Id. at

6   786.

7           The California Court of Appeal was the last state court to issue a reasoned

8   decision addressing petitioner's claims.

9   III.  Factual Background

10          The opinion of the California Court of Appeal contains a factual summary.  After

11  independently reviewing the record, the undersigned finds this summary to be accurate and

12  adopts it herein.

13                  FACTUAL AND PROCEDURAL BACKGROUND

14          A. Robberies Near Modesto-October 2002:

15          On October 27 and 28, 2002, two men robbed a Motel 6 in
            Modesto, a Stop 'N Save convenience store in Modesto, a Quik
16          Stop convenience store in Ripon, and a Denny's restaurant in
            Lathrop. The robbers were dressed in dark clothing, ski masks and
17          gloves. One robber had a gun. The victims were unable to identify
            the two men who robbed them.
18
            B. Discovery Of Daniel MacDougall's Body-November 5, 2002:
19
            Fourteen-year-old Daniel MacDougall lived with his parents Kerry
20          and Elizabeth MacDougall in Tracy. Kerry MacDougall worked
            nights. He suffered from a partial hearing loss and was a heavy
21          sleeper. Kerry did not hear Elizabeth leave for work before dawn
            on the morning of November 5, 2002.
22
            Daniel usually left for school around 6:30 or 7:00 a.m., turning off
23          the house alarm and locking the front door with his key. He
            telephoned his friend V.M. at 6:22 a.m. on November 5, 2002, but
24          did not show up to walk to school with her as planned. V.M. tried
            unsuccessfully to reach Daniel by phone between 7:00 and 7:30
25          that morning.

26  ////

4

Manuel Reyes, who lived in the neighborhood, drove past the entrance to the MacDougall's street at 6:30 a.m. on November 5, 2002. He noticed that the front door of the MacDougall house was standing open. Reyes saw two young men walking toward the door. The first man was about 5 feet 10 inches tall. The second man's face was red, as if he had been running, but he had a lighter Hispanic complexion than the first man. Both wore dark, baggy clothing and head coverings.

Kerry discovered Daniel's body in a large pool of blood in the front entry hallway when he came downstairs around 9:00 a.m. Daniel was dressed for school and held the front door key in his hand. Kerry called 911 and waited for the police to arrive.

The initial police investigation revealed that Daniel had died an hour or more before Kerry discovered the body. Nothing in the rest of the house was disturbed or bloodstained. However, the front door was damaged and investigators found a shoe impression near the door handle.

The MacDougalls, who were ex-Marines, had a gun collection which they kept in a large gun safe in the garage and a smaller safe in the master bedroom. The only fingerprints on the gun safe were Kerry's. None of the MacDougall weapons fired the fatal shot.

The autopsy revealed that the cause of death was a massive head wound from a .38 or .357-magnum round-jacketed hollow bullet. Investigators found no weapon at the scene. Daniel was shot at close range. The bullet lodged behind his left jawbone.

Tracy police detectives had no specific suspects after nearly two months of investigation, but the case started to break at the end of December 2002 with the recovery of Gonzales's cell phone and Gonzales's return to Duell Vocational Institute (DVI) for a parole violation.

C. Recovery Of Gonzales's Cell Phone-December 22, 2002:

On December 22, 2002, Modesto Police Detective Phillip Owen responded to a call from a Modesto store owner who had shot a man who had attempted to rob him. The would-be robber, later identified as Manuel "Wino" Quijas, was dead at the scene. Owen found a loaded handgun and a cell phone in Quijas's possession. The cell phone belonged to Gonzales.

In an attempt to identify the body, Detective Owen left messages for Gonzales to call him. Gonzales contacted Detective Owen two days later and confirmed that his cell phone had been missing from his bedroom for a couple of days.

////

The prosecution produced the records for Gonzales's cell phone at trial. The records for November 5, 2002, were consistent with other testimony regarding contacts between Gonzales and the principal players in the MacDougall crime.

D. Gonzales Requests Meeting With Police-January 27, 2003:

In August 2002, Gonzales was released on parole after serving a prison sentence for assault with a deadly weapon. On December 24, 2002, he was rearrested for a parole violation after failing a drug test. Gonzales arrived at DVI on December 30, 2002.

On January 27, 2003, Sergeant David Stapp, the supervisor of the reception center at DVI, received a letter from Gonzales requesting a confidential meeting. Gonzales indicated that he had urgent information about a murder. Stapp set up the meeting. He observed that Gonzales was very nervous. Gonzales asked Stapp to contact Detective Phillip Owen of the Modesto Police Department, stating that he had information about the Sund-Palosso murders in Yosemite and a recent murder in the local area.

Sergeant Stapp and Owen both knew that Cary Stayner had been convicted of the Sund-Palosso murders, and Detective Owen was unaware of any other unsolved murders in the Modesto area. Owen asked Sergeant Stapp to get more information from Gonzales.

E. Statements Made By Gonzales-January 31, 2003:

During his second interview with Sergeant Stapp, Gonzales stated that he had information about the murder of Daniel MacDougall in Tracy. He added, "'I was there.'"  Gonzales requested that an attorney be present before he continued his conversations with law enforcement. Stapp ended the interview and contacted Detective Dean Hicks at the Tracy Police Department. Hicks arranged to conduct a videotaped interview with Gonzales at DVI that afternoon.

Detective Shawn Steinkamp and Deputy District Attorney Todd Turner accompanied Detective Hicks to the interview. According to Hicks, Gonzales was willing to provide information but did not want to receive any time as a result of doing so. Steinkamp explained to Gonzales that they needed to hear what Gonzales knew before they could make any deals. Gonzales responded, "[It] ain't gonna work that way."

F. DVI Contacts Lead To Christina Flores:

Sergeant Stapp identified Gonzales's girlfriend Christina Flores as a frequent visitor to Gonzales at DVI. Stapp discovered two addresses for Flores in the DVI records: (1) as Gonzales's girlfriend living at an address in Tracy; and (2) as his wife living at

6

the same address as Gonzales's parents in Modesto.

Flores and Gonzales's mother, Deborah Phipps, visited Gonzales on February 15, 2003. Stapp and Detective Hicks reviewed the audio recording of that visit. Among other things, Gonzales told the two women to make sure that Flores stayed at his parent's residence to keep her from "running her fucking mouth to the homicide detective" and others.

Modesto police executed a search warrant at the parent's address on February 27, 2003. The search revealed gang indicia, rap lyrics that appeared to have been authored by Gonzales at DVI, and letters from Gonzales to his mother and Flores. The officers found Flores in her bedroom. She asked to be taken to the police department in handcuffs so that Gonzales's parents would be unaware that she wanted to cooperate. The police provided Flores with protection. Flores became the prosecution's star witness.

G. Flores's Sister Was The Link To Daniel:

Christina Flores's younger sister, S.F., was Daniel's girlfriend. In October 2002, Gonzales and Flores overheard a cell phone conversation between S.F. and Daniel. Gonzales took the phone and the conversation turned to what types of guns Daniel's father collected. After the phone conversation about the guns, S.F. invited Flores and Gonzales to Daniel's house to meet Daniel face-to-face. Daniel, who was home alone, gave them a tour of the house and garage where they saw the safe containing the gun collection. Daniel explained that only his father could open the safe. S.F. did not tell police about the phone call or home tour until they served a search warrant on the Flores family residence in Tracy on February 27, 2003.

H. Flores Provides Information About Daniel's Murder:

Flores had a juvenile record and associated with Norteños and Norteño "wannabes" at the time of Daniel's murder. She enjoyed the gang identity, personal notoriety and respect.

Both Gonzales and Barragan told Flores that they shot Daniel. Gonzales confessed to Flores within hours of the murder; Barragan confessed to her in February 2003.

Flores knew about the plans for a home invasion robbery and observed Gonzales's efforts to recruit others to take part. Gonzales shared his plans with Barragan, Herrera and Dominguez. Gonzales bragged that they could get 45 guns from the MacDougall house. According to Flores, Gonzales and his cohorts considered several approaches to the problem of opening the gun safe without a key or combination. Flores provided information about the interior of the MacDougall home. Gonzales eventually decided to take Daniel

hostage before school and wait for his parents to return home to unlock the safe. The four participants would divide up the guns to sell or keep for themselves. Flores would share what Gonzales received. They purchased a scanner, walkie-talkies and masks.

Flores testified that on the morning of November 5, 2002, Gonzales left their apartment around 4:00 a.m. He returned around 9:00 a.m., wearing all black. Flores described his face as pale "beyond white." Gonzales wrapped himself around Flores and started crying. Flores asked if anybody got hurt. Gonzales responded, "Titi, Daniel's dead." He told her that he had driven Barragan, Herrera and Dominguez to the MacDougall house in her father's Mazda. The four participants watched someone drive away from the house at 5:30 a.m. At that point, Gonzales and Barragan went up to the house and Gonzales kicked the door. When Daniel came out of the house, Gonzales and Barragan ran up wearing masks and told Daniel to go inside. Gonzales told Flores that he shot Daniel in the head when Daniel took off running. Gonzales stopped Flores from calling her sister. He told her to stay quiet because the others wanted to kill her.

I. Flores Links Barragan And Gonzales To The October Robberies:

Flores also testified that Barragan and Gonzales were responsible for the four unsolved robberies that took place in October 2002 in the Modesto area. Defendants wore masks and gloves and at least one of them carried a gun. Flores participated in three of the robberies.

J. Statements Made By Gonzales-February 27, 2003:

Detective Hicks returned to DVI after interviewing Flores on February 27, 2003, and told Gonzales that there would be "no deal" and no immunity from prosecution. Hicks advised Gonzales of his <u>Miranda</u> rights. FN2  Gonzales started crying and repeated over and over, "Take me to trial."

> FN2. <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>).

K. Statements Made By Gonzales-March 12, 2003:

On March 12, 2003, at DVI, Detective Hicks served an arrest warrant on Gonzales and transported him to the Tracy Police Station where he was booked and interviewed. Detective Steinkamp advised Gonzales of his <u>Miranda</u> rights and Gonzales responded that he understood. When advised again that there would be no immunity deal, Gonzales stated that the district attorney "better ... come in with immunity or he wasn't gonna say anything." At one point, Steinkamp told Gonzales that he knew Gonzales was there when Daniel MacDougall was murdered. The

conversation turned to the murder weapon and Gonzales said that he knew that Steinkamp did not have the gun. Gonzales then asked, "'What if I could get it for you?'" He continued, "'What if I told you I saw Daniel MacDougall die?'" The interview ended with Gonzales reiterating his desire for immunity and Steinkamp saying that it "wasn't gonna happen."

Detectives Steinkamp and Hicks took Gonzales's fingerprints and palm prints at booking. As Hicks took the palm prints, Gonzales laughed and said, "'What are you doing that for? I was wearing gloves.'" Hicks asked, "'What kind of gloves,'" and Gonzales responded, "'Burners.'" Hicks testified to his understanding of the term "burners."

L. Gonzales's Statements To Michael Cain-March 2003:

Meanwhile, at DVI, inmate Michael Cain contacted Sergeant Stapp. Cain provided Stapp with notes from a series of conversations he had with Gonzales when both were housed in the same wing. Gonzales told Cain that he and his homies of the Nuestra Familia planned the home invasion robbery of the MacDougall home in order to get guns and other weapons, including a grenade launcher, from three safes. He identified himself, Barragan, "Huero" and "Spider" as the perpetrators. Gonzales said that he and Barragan accosted Daniel as he started to leave the house. Gonzales warned Daniel not to look at him and shot him when he did. Gonzales told Cain at least 15 times that he was the shooter. Other times, Gonzales stated that Barragan fired the fatal shot.

Gonzales said that his cell phone wound up in the hands of "Wino" who was killed in a robbery. Gonzales made threats against Flores and other family members who knew about his crimes.

M. Barragan's Statements To Marcos Medina-April 2003:

Meanwhile, defendant Barragan returned to prison custody on a parole violation. In April 2003, Marcos Medina and Barragan spent four hours in adjoining holding cells at DVI. Barragan, who introduced himself as "Psycho" and "Victor," told Medina that he was on the way to court in Tracy in connection with the murder of a boy in a home invasion robbery. Barragan said that the only proof against them was a female witness, "Stranger's" girlfriend. Barragan planned to save up money to have one of his codefendants take the blame or to kill the witness. He maintained that they would "beat the case" if she were gone.

N. Juan Carlos Herrera And The Murder Weapon-May 2003:

When Juan Carlos Herrera was arrested in May 2003 for being a felon in possession of a firearm, he mentioned to the arresting

officers that he had information about the Tracy [MacDougall] murder. Juan Carlos, a brother to Gerardo Herrera then a codefendant in the MacDougall case, cut a deal in which the district attorney would drop the charge of illegal possession, ask the California Youth Authority (CYA) not to violate his parole, and provide him with protection. Juan Carlos testified that he heard Barragan and Gonzales talking about the murder a few days after Daniel was shot, when a group of Norteños gathered at Dominguez's house. Barragan said that they intended to do a home invasion robbery and "a kid got killed" inside the residence. Barragan had mentioned Gonzales's name in front of Daniel so Gonzales told Barragan to kill him. Gonzales knew the people at the MacDougall house. When Barragan told Gonzales something like "You [could] end up like that little kid," Gonzales laughed.

Barragan stated at the gathering that the murder weapon had been melted down, but Juan Carlos did not believe it. He noticed a chrome, snub-nosed .357 Rossi on the table. Juan Carlos told Detective Hicks that he had fired the Rossi six months earlier in Del Puerto Canyon in Patterson. With the help of Juan Carlos, Detective Hicks recovered bullets at that site. Analysis revealed that the bullets found in Patterson were fired from the same gun that fired the bullet that killed Daniel.

O. Gerardo Herrera Testifies Against Barragan and Gonzales:

Police arrested Gerardo Herrera in March 2003. He faced the same charges as Barragan, Gonzales and Dominguez. After the preliminary hearing in September 2003, Herrera agreed to cooperate with the prosecution. He entered a plea for which he received an 11-year sentence.

Herrera testified that he, Dominguez, and Gonzales were Norteños. Barragan was a Norteño part of the time. The four of them met the night before the murder at Dominguez's house. Barragan and Gonzales needed money and wanted to commit the robbery at the MacDougalls' home. They told Herrera that they would telephone him when they decided what to do. Herrera stated he had no plan to share any of the weapons with the Nuestra Familia.

According to Herrera, it was agreed that Gonzales and Barragan would break into the house. They made several unsuccessful attempts while Herrera and Dominguez drove around the area. Herrera and Dominguez picked up Gonzales and Barragan after the last attempt. Barragan appeared frightened and said, "Go. Go. Just speed up." Barragan told them that he had shot Daniel.

They drove to Stockton. Barragan telephoned his girlfriend Melynda Silveria who lived there. Silveria picked up Herrera, Dominguez and Barragan. Gonzalez drove away in the Mazda. Herrera left the Rossi gun on the table at Dominguez's house.

P. The Norteño Connection:

Detective Richard Delgado, the prosecution's gang expert, described the Norteños as a criminal street gang that answered to the Hispanic prison gangs. He testified that in the hierarchy of northern gangs, the Nuestra Familia prison gang was above the Northern Structure prison gang. In Delgado's view, Gonzales, Barragan, Dominguez, and Herrera were active members of a Norteño street gang on November 5, 2002. Delgado opined that the Norteño gang, as well as the Northern Structure, had directed its members to form teams and commit home invasion robberies to obtain weapons for the benefit of the gang.

Q. Gonzales Testifies At Trial:

Gonzales's account of the events minimized his participation and differed from the testimony provided by others in one significant detail-he substituted Herrera for Barragan. He testified that Herrera was the organizer and shooter. Gonzales claimed that he participated because he feared Herrera. He testified that en route to Tracy, he disagreed with Herrera's plan to go to the MacDougalls' house. Gonzales heard Herrera cock a gun and saw Herrera's finger on the trigger.

Gonzales also testified that he was on the doorstep of a nearby house at the moment Daniel was shot. He explained his confession to Flores as something Herrera told him to do. Gonzales testified that Herrera's rationale was that Flores would go to the police if she knew that Herrera shot Daniel, but would not tell the police if Gonzales were the killer. Gonzales also denied any involvement in the October 2002 robberies.

R. Barragan's Defense:

Barragan's attorney reminded jurors in closing argument that Gonzales and Flores knew that Barragan was on the Norteño's "bad news list." He reviewed the several ways a person could get his name on the list: "Either you didn't back up another fellow Norteño, or sometime in the past you snitched, gave information to law enforcement, whatever it is. You can't be trusted." Barragan's attorney argued that no dedicated Norteño like Gonzales would have committed a crime like this one with someone on the "bad news list."

(Dkt. 1, at 53-65 of 150.)

////

////

////

11

IV.  <u>Discussion</u>

        A.  <u>Alleged Violation of Right to Self-Representation</u>

        Petitioner argues that he was denied his right to self-representation when the trial court denied his <u>Faretta</u>[1] motion made on the fifth day of the preliminary hearing.  The California Court of Appeal denied this claim for the reasons stated herein:

> On July 29, 2003, the fifth day of a nine-day preliminary hearing, Barragan requested a <u>Marsden</u> hearing.  FN3  Barragan argues that he made a timely and unequivocal request under <u>Faretta v. California</u> (1975) 422 U.S. 806 (<u>Faretta</u>) to represent himself after the court denied his <u>Marsden</u> motion, and the court erred in denying it.  We conclude that Barragan's request to represent himself was neither unequivocal nor timely, and the court did not err in denying it.

> FN3. <u>People v. Marsden</u> (1970) 2 Cal.3d 118.

> Criminal defendants who want to act as their own attorneys have a constitutional right to do so. (<u>People v. Hines</u> (1997) 15 Cal.4th 997, 1028, citing <u>Faretta</u>, <u>supra</u>, 422 U.S. at p. 834.) The erroneous denial of a request for self-representation is reversible per se. (<u>People v. Joseph</u> (1983) 34 Cal.3d 936, 948.)  However, the defendant's request must be timely and unequivocal. (<u>People v. Horton</u> (1995) 11 Cal.4th 1068, 1107.)  "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. *A motion for self-representation made in passing anger or frustration*, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice *may be denied.*" (<u>People v. Marshall</u> (1997) 15 Cal.4th 1, 23, italics added.)

> Frustration is a common response when the court denies a defendant's request to substitute counsel, often rendering the subsequent <u>Faretta</u> motion equivocal. (<u>People v. Barnett</u> (1998) 17 Cal.4th 1044, 1087 [defendant's single reference to representing himself was properly viewed as an "impulsive response" to the court's refusal to immediately consider his <u>Marsden</u> request]; <u>Jackson v. Ylst</u> (9th Cir.1990) 921 F.2d 882, 888 [<u>Faretta</u> request not unequivocal where it was an "impulsive response" to the trial

---

[1] <u>Faretta v. California</u>, 422 U.S. 806 (1975).

court's denial of defendant's motion to substitute counsel and was not renewed at the next court date].)

To assess a <u>Faretta</u> claim, we review the entire record de novo to determine whether the defendant's invocation of the right to self-representation was knowing and voluntary.  (<u>Marshall</u>, <u>supra</u>, 15 Cal.4th at p. 24.)  The standard of review applicable to the court's determination that defendant's request was equivocal or untimely is less clear.  (<u>Id.</u> at p. 25.)  However, we conclude that under either de novo review or the deferential substantial evidence standard, the court properly rejected what was clearly an untimely "motion for self-representation made in passing anger or frustration."  (<u>Id.</u> at p. 23.)

We summarize the <u>Marsden</u> hearing in detail because it provides the context within which Barragan raised <u>Faretta</u>. The in camera <u>Marsden</u> hearing took place during the preliminary hearing testimony of Melynda Silveria, Barragan's former girlfriend. Barragan initially complained about his inability to view certain videotapes even though the court had continued the preliminary hearing for that purpose.  Barragan also complained of his limited contact with his attorney Doug Jacobsen and his investigator since his arrest in March.  Barragan stated, "I just feel I should be better represented...."  Attorney Jacobsen explained the difficulty with arranging for Barragan to see the videotapes.

The court found that "[n]one of this, as far as I can tell, has to do with the quality of representation that Mr. Jacobsen's giving under the circumstances."  The court expressed doubt that Barragan had any "constitutional or statutory right to [the videotapes] prior to the preliminary hearing."  The court assured Barragan that he had a well-respected criminal defense attorney and found that there had been "no substantial impairment of [Barragan's] right to counsel."

The discussion continued. Barragan complained that he did not understand his case. He had done research and cited the legal premise that inadequate investigation denies a criminal defendant a meaningful defense. Jacobsen returned to the limited contact issue and responded that although he had difficulty scheduling meetings with Barragan at DVI he had talked with him between 15 and 20 times – "almost every time we come to court."  Jacobsen believed that he had excellent communication with Barragan.

The court explained matters to Barragan and ultimately denied the <u>Marsden</u> motion.

After a brief discussion about transportation issues, Barragan reiterated his complaint that he did not understand what was going on in his case in spite of receiving regular written reports.  The court stated, "We're going to proceed today."  Barragan responded: "[I]f this is not granted, I would like to file a <u>Faretta</u> motion."  This

prompted the following exchange:

"THE COURT: Well, wait a minute. I don't understand. Do you understand what a <u>Faretta</u> motion is?

"DEFENDANT BARRAGAN: Yeah, it's basically pro per with co-counsel, and I've read up a little bit. I don't really understand that.

"THE COURT: You don't, because if you ask to represent yourself, that doesn't mean you get co-counsel.

"DEFENDANT BARRAGAN: That's fine.

"THE COURT: And you just got through telling me that you don't understand what's going on now. The two concepts are completely diametrically opposed. That means it doesn't make any sense that you don't understand what's going on, but at the same time you want to represent yourself. That would be probably one of the stupidest things you ever did in your life, and the law requires me to tell you how stupid that is.

"DEFENDANT BARRAGAN: That's fine.

"THE COURT: So I'm telling you that now, okay. I think you ought to sleep on that at least. But for now, it's real late to ask to represent yourself. We're in the middle of the preliminary hearing. I'm not going to give you time to get up to speed to represent yourself. If you want to renew your <u>Faretta</u> application at the conclusion of the preliminary hearing, I suppose I have to consider that, but right now-

"DEFENDANT BARRAGAN: What can I do?

"THE COURT: Excuse me, right now, I'm going to find that that is-the request is late and it will only serve to disrupt the proceedings, and we're going to let Mr. Jacobsen continue to represent you at this stage."

At that juncture, Barragan stated that he did not want to be represented by Jacobsen, did not get along with him, and did not want to sit down in the courtroom. The court asked the bailiff to take Barragan back to the courtroom, Barragan repeated that he did not want to go to the courtroom and did not want to be represented by Jacobsen. When the court asked, "Are you refusing to go back into the courtroom?" Barragan responded, "I would like to practice my rights of the <u>Faretta</u> motion." The court stated, "Yeah, that will be denied based on what I just said." Jacobsen asked for leave to talk to his client.

14

This record reveals that Barragan had two opportunities during the Marsden hearing to convince the court that Jacobsen failed to communicate or keep Barragan abreast of what was happening in the case. With each denial, Barragan continued to try to frustrate the court's effort to proceed with the preliminary hearing by stating that he did not understand what was happening in the case. The court noted that reports summarizing the case had been available.

Considering Barragan's conduct as well as his words (Marshall, supra, 15 Cal.4th at p. 23), we conclude that Barragan's request to proceed "in pro per" was a passing, impulsive response to the court's denial of his request to replace Jacobsen. The record suggests that the tension continued to build after the court encouraged Barragan to be patient, trust his attorney, and not let his emotions get away from him. It culminated in Barragan's request to represent himself and apparent refusal to return to the courtroom. Based on Barragan's repeated claim that he did not understand the case, we cannot say that his Faretta request was informed or unequivocal.

The court encouraged Barragan to "sleep on" the request to represent himself. Barragan did not renew his Faretta request during the preliminary hearing – another indication that the initial request was merely a passing, impulsive response to the court's denial of the Marsden motion. (See Jackson v. Ylst, supra, 921 F.2d at p. 888.)

The record also supports the court's finding that Barragan's request was untimely.  Barragan complained that he did not understand the case just before he asked to proceed in pro per. It was therefore reasonable for the court to conclude that a ruling in Barragan's favor would disrupt the proceedings, requiring a continuance to enable Barragan to review the videotapes he had not been able to view at DVI, get up to speed on what he did not understand about his case, and prepare to actively participate in the remainder of the preliminary hearing. The court, five days into a nine-day preliminary hearing had already continued it for more than five weeks.

(Dkt. 1, at 66-72.)

The California Court of Appeal found that petitioner's request for self-representation was untimely and equivocal.

In the Sixth Amendment's right to counsel is the right of a criminal defendant to represent himself at trial, if he so chooses.  Faretta v. California, 422 U.S. 806, 832 (1975). To invoke his right to self-representation, a defendant's request must be knowing, voluntary,

1    intelligent, unequivocal, timely, and not for purposes of delay.  Stenson v. Lambert, 504 F.3d

2    873, 882 (9th Cir. 2007); United States v. Mendez-Sanchez, 563 F.3d 935, 945-46 (9th Cir.

3    2009) ("Because the exercise of self-representation cuts off the exercise of the right to counsel,

4    often to individual detriment, we recognize the right only when it is asserted without

5    equivocation. (Footnote omitted.) However, '[i]f [the defendant] equivocates, he is presumed to

6    have requested the assistance of counsel.'") (quoting Adams v. Carroll, 875 F.2d 1441, 1444 (9th

7    Cir. 1989)); see also Faretta, 422 U.S. at 835 ("Faretta clearly and unequivocally declared to the

8    trial judge that he wanted to represent himself and did not want counsel.").

9            Generally, to determine whether a request for self-representation was unequivocal,

10   courts consider "the timing of the request, the manner in which the request was made, and

11   whether the defendant repeatedly made the request." Stenson, 504 F.3d at 882.  Further, a

12   request for self-representation is considered equivocal when it is "a momentary caprice," the

13   "result of thinking out loud," or otherwise an "impulsive response" to having another request

14   denied, such as a request for substitute counsel.  See Jackson v. Ylst, 921 F.2d 882, 888-89 (9th

15   Cir. 1990); see also Adams, 875 F.2d at 1445.  Regardless, the determination of whether a

16   petitioner unequivocally requested self-representation is a factual matter and "federal courts must

17   give significant deference to the trial court's factual findings." Stenson, 504 F.3d at 882 (citing §

18   2254(e)(1)).

19           Regarding the timeliness of a Faretta motion, because the Supreme Court has not

20   established exactly what makes a Faretta request timely, beyond the holding in Faretta itself that

21   "weeks before trial" is sufficient, other courts are free to determine standards of their own.  See

22   Faretta v. California, 422 U.S. 806, 835-36 (1975).  The Ninth Circuit has previously upheld the

23   California standard that a Faretta motion to represent oneself at trial, made the day of trial, is

24   untimely.  Marshal v. Taylor, 395 F.3d 1058, 1061-62 (9th Cir. 2005).

25           After reviewing the transcript from the Marsden hearing where the trial court

26   addressed petitioner's Faretta motion, the undersigned finds that the California Court of Appeal's

1  denial of petitioner's claim alleging a violation of his right to self-representation was not an

2  unreasonable application of clearly established Supreme Court authority.  (See Marsden hearing

3  transcript, filed under seal on March 17, 2011 (Dkt. No. 18)).  Petitioner's request for self-

4  representation was an impulsive response to the trial court's denial of his Marsden motion.  As

5  such, it was equivocal.  The motion was also made on the fifth day of the nine day preliminary

6  hearing.  For this reason, and because it would have taken petitioner some time to "get up to

7  speed" in order to represent himself, the request was untimely.

8  　　　　　　For the reasons discussed above, this claim should be denied.

9  　　　　　　B.  Alleged Violation of Right to Confront Witnesses

10  　　　　　　Petitioner argues that his right to confront witnesses was violated by the

11  admission of Melynda Silveria's preliminary hearing testimony.  The California Court of Appeal

12  denied this claim for the reasons stated herein:

13  　　　　　　Barragan's girlfriend, Melynda Silveria, testified at the preliminary
　　　　　　hearing about Barragan's post-crime flight. She stated that
14  　　　　　　Barragan had telephoned her on a morning sometime in early
　　　　　　November 2002 from a telephone near the Carl's Jr. Restaurant on
15  　　　　　　Hammer Lane in Stockton. He asked her to pick him up and drive
　　　　　　him home to Modesto. When Silveria arrived at the restaurant, she
16  　　　　　　saw Barragan, Dominguez, and Gerardo Herrera standing outside
　　　　　　together. Silveria's friend Rosemary Mejia rode with her when she
17  　　　　　　drove the three men to Modesto. Silveria testified that she did not
　　　　　　see Gonzales at the restaurant, but recognized his car parked
18  　　　　　　nearby. When the prosecution was unable to serve Silveria with a
　　　　　　subpoena to testify at trial, the court conducted an "unavailability
19  　　　　　　hearing" and admitted her preliminary hearing testimony under
　　　　　　Evidence Code sections 240 and 1291. FN8
20
　　　　　　　　　FN8. Evidence Code section 1291, subdivision (a)
21  　　　　　　　　　provides:

22  　　　　　　　　　"Evidence of former testimony is not made
　　　　　　　　　inadmissible by the hearsay rule if the declarant is
23  　　　　　　　　　unavailable as a witness and:

24  　　　　　　　　　"(1) The former testimony is offered against a
　　　　　　　　　person who offered it in evidence in his own behalf
25  　　　　　　　　　on the former occasion or against the successor in
　　　　　　　　　interest of such person; or
26

"(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

Evidence Code section 240 reads in relevant part:

"(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' " means that the declarant is any of the following: [¶] ... [¶] (4) Absent from the hearing and the court is unable to compel his or her attendance by its process. [¶] (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Defendants contend that the court violated their right to confront Silveria and the statutory bars to the admission of hearsay by allowing the prosecution to use Silveria's preliminary hearing testimony at trial. Citing <u>People v. Cromer</u> (2001) 24 Cal.4th 889 (<u>Cromer</u>), they argue that the prosecution's effort to secure Silveria's presence at trial was "desultory and passive and late." Defendants assert that the prosecution knew after the preliminary hearing that Silveria did not want to testify, but did nothing to locate her until the trial was well under way. There is no merit in defendants' contentions. FN9

> FN9. The Attorney General states in respondent's brief that "[a]n issue not raised but fairly present[ ] is whether the use of prior recorded testimony, as a question of law, violated Confrontation rights under <u>Crawford v. Washington</u> (2004) 541 U.S. 36, 124 S. Ct. 1354 [<u>Crawford</u>]." Having set up this straw man, the Attorney General proceeds to knock it down by claiming that defendants waived the <u>Crawford</u> issue by failing to object at trial. However, defendants' confrontation challenge is focused instead on the question whether the prosecution exercised due diligence in attempting to secure Silveria's presence at trial. That question was presented at the March 10, 2005, due diligence hearing and is properly before us on appeal.

"A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The

constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' [Citations.] The California Evidence Code contains a similar requirement. As relevant, it provides that to establish unavailability, the proponent of the evidence, here the prosecution, must establish that the witness is absent from the hearing and either that 'the court is unable to compel his or her attendance by its process' (Evid.Code, § 240, subd. (a)(4)) or that the proponent 'has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process' (Evid.Code, § 240, subd. (a)(5)).... The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable. [Citation.]" (People v. Smith (2003) 30 Cal.4th 581, 609 (Smith).)

The Supreme Court explained in Cromer that "that the term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.] Relevant considerations include '"whether the search was timely begun"' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (Cromer, supra, 24 Cal.4th at p. 904.) At the same time, "[a]n appellate court 'will not reverse a trial court's determination [under § 240] simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution. Where the record reveals, ... that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] *The law requires only reasonable efforts, not prescient perfection.*' [Citations.]" (People v. Diaz (2002) 95 Cal.App.4th 695, 706 (Diaz), italics added.) "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (People v. Cummings (1993) 4 Cal.4th 1233, 1298.)

Whether the prosecution exercised due diligence is a factual question which turns on the circumstances in each case.  People v. Hovey (1988) 44 Cal.3d 543, 563.) On appeal, we decide the question of due diligence independently, not deferentially. (Cromer, supra, 24 Cal.4th at p. 901.)

The record in this case reveals that Silveria had been difficult to serve with a subpoena for the preliminary hearing in 2003. Because of her relationship with Barragan, Silveria "didn't want to have anything to do with it." Silveria acknowledged at the preliminary hearing that she knew Flores and it is reasonable to conclude that this fact may have influenced Silveria's later efforts to evade service of the subpoena for trial.

19

When investigator Tom Ribota was assigned service of the subpoena, he followed several lines of inquiry between January 19, 2005, and the unavailability hearing on March 10, 2005. Silveria lived with her mother, K. Cooper, at the time of the preliminary hearing. Ribota traced Cooper to a new address and spoke with her in person on two occasions. Cooper indicated that Silveria was "in and out of the house," but refused to receive the subpoena for her. Ribota left his business card and asked Cooper to have Silveria call him. Cooper told Ribota the following day that she had given the business card to her daughter and told her that the investigator had a subpoena. Ribota returned to Cooper's house at least three more times, but Cooper said that she had not seen Silveria. Ribota served Cooper with a subpoena for the unavailability hearing. Ribota also attempted to contact Silveria through her sister. He stopped by the sister's home on three occasions, but no one was home. Ribota made two visits to the fitness center where Silveria had worked. He learned that she left the previous October. A supervisor, who was a friend of Silveria's, chuckled when Ribota asked if she would tell him if she knew where to find Silveria. Ribota also contacted the local hospitals, checked criminal history, and reviewed motor vehicle records with no success. After learning that Silveria had visited Barragan in jail in January, Ribota asked that he be contacted if Silveria made a return visit. Silveria did return to visit Barragan in jail the night before the unavailability hearing, but no one contacted Ribota.

At the close of the unavailability hearing, the court found that the prosecution had made significant efforts to locate and serve Silveria. It noted that Silveria was aware that trial was underway, knew that the prosecution was looking for her, and was clearly evading court process.

In claiming error on appeal, defendants rely on Cromer, a case that focused almost entirely on the standard of review applicable to a trial court's due diligence determination. (24 Cal.4th at p. 893.) Applying the independent standard of review, the Cromer court affirmed the appellate court's conclusion that the prosecution failed to demonstrate due diligence in its efforts to locate the victim of an armed robbery who had identified defendant in a photo lineup. The witness's testimony was the only evidence presented in support of the single count at issue on appeal. (Id. at pp. 893, 903.) The record in Cromer revealed the following undisputed facts: "Although the prosecution lost contact with [the witness] after the preliminary hearing, and within two weeks had received a report of her disappearance, and although trial was originally scheduled for September 1997, the prosecution made no serious effort to locate her until December 1997. After the case was called for trial on January 20, 1998, the prosecution obtained promising information that [the witness] was living with her mother in San Bernardino, but prosecution investigators waited two days to check out this information. With jury selection under way, an investigator went to

1  [the witness's] mother's residence, where he received information
   that the mother would return the next day, yet the investigator
2  never bothered to return to speak to [the witness's] mother, the
   person most likely then know where [she] then was. Thus, serious
3  efforts to locate [the witness] were unreasonably delayed, and
   investigation of promising information was unreasonably
4  curtailed." (Id. at p. 903.)

5  The court reached a different conclusion in Diaz, where the facts
   more closely resemble the facts in the case before us. The Diaz
6  court held that the court properly admitted the witness's
   preliminary hearing testimony because the prosecution
7  demonstrated due diligence and it was "fairly clear that [the
   witness] purposely made herself unavailable because she was
8  unwilling to testify." (Diaz, supra, 95 Cal.App.4th at p. 706.)  As in
   this case, the prosecution in Diaz made more than five attempts to
9  personally serve the witness, contacted the witness's mother and
   brother, and checked with local hospitals, the Department of Motor
10 Vehicles, and arrest records. Like Silveria's mother, the brother of
   the witness in Diaz told the prosecution that the witness knew the
11 police were looking for her. He also said that she was determined
   not to testify. (Id. at pp. 706-707.)  The detective in Diaz indicated
12 that the witness was fearful because it was a gang case. In his
   opinion, serving the witness "well in advance of trial would have
13 only ensured her unavailability." (Id. at p. 707.)

14 In light of the circumstances of the case before us, including the
   prosecution's substantial efforts to serve the subpoena on Silveria,
15 the fact that Silveria knew Flores and must have been aware of
   Barragan's gang connections, and the clear evidence that Silveria
16 was purposefully avoiding service of process, we conclude that the
   prosecution demonstrated due diligence. Accordingly, the court did
17 not err in admitting Silveria's preliminary hearing testimony.

18 (Dkt. 1, at 106-13 of 150.)

19    The Confrontation Clause applies to all out-of-court testimonial statements

20 offered for the truth of the matter asserted, i.e., "testimonial hearsay." Crawford v. Washington,

21 541 U.S. 36, 42 (2004).  Prior testimony at a preliminary hearing is testimonial hearsay and is

22 barred under the Confrontation Clause unless:  (1) the witness is unavailable; and (2) the

23 defendant had a prior opportunity to cross-examine the witness.  Id. at 1369, 1374.

24    To establish unavailability, the prosecutor must show that he made a good faith

25 effort to obtain the witness's presence at trial.  Barber v. Page, 390 U.S. 719, 724-25 (1968);

26 United States v. Olafson, 213 F.3d 435, 441-42 (9th Cir. 2000) (good faith effort demonstrated

1   where border patrol agents called witness, who had been inadvertently returned to Mexico, but

2   witness refused to return to testify); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1102 (9th Cir. 1998)

3   (prosecutor made a good-faith effort to locate witness where he subpoenaed witness, met with

4   witness to discuss proposed testimony after issuing subpoena, tried to call witness three times as

5   trial date approached, contacted witness's parole officer, had a bench warrant issued for witness's

6   arrest, and assigned a criminal investigator who searched at places witness was known to

7   frequent).

8          If the state does not make any effort to secure the witness's attendance, the good

9   faith requirement has not been met and the witness is not legally unavailable.  <u>Whelchel v.</u>

10  <u>Washington</u>, 232 F.3d 1197, 1209 (9th Cir. 2000). "'Good faith' and 'reasonableness' are terms

11  that demand fact-intensive, case-by-case analysis, not rigid rules." <u>Christian v. Rhode</u>, 41 F.3d

12  461, 467 (9th Cir. 1994).

13         The undersigned has reviewed the testimony from the unavailability hearing.

14  (Reporter's Transcript ("RT"), Volume 9 of 18, at 2460-89.)  The opinion of the California Court

15  of Appeal accurately summarizes the attempts made by the prosecution to locate Silveria.

16         After reviewing the record, the undersigned finds that the California Court of

17  Appeal's denial of petitioner's claim alleging a violation of the Confrontation Clause was not an

18  unreasonable application of clearly established Supreme Court authority.  The record

19  demonstrates that the prosecution made substantial, good faith efforts to locate Silveria, who was

20  clearly attempting to elude service.  While petitioner argues that the prosecution showed bad

21  faith by not attempting to locate this reluctant witness sooner, the undersigned does not find that

22  this circumstance demonstrated a lack of due diligence.  For these reasons, the admission of

23  Silveria's preliminary hearing testimony did not violate petitioner's rights under the

24  Confrontation Clause.  Accordingly, this claim should be denied.

25  ////

26  ////

1                      C.  Alleged Error in Admission of Prior Crimes

2                      Petitioner argues that the trial court erred in admitting evidence regarding his prior

3    crimes.  The California Court of Appeal denied this claim for the reasons stated herein:

4              The prosecution moved in limine to introduce Flores's testimony
               about six robberies that defendants were involved in close to the
5              time of Daniel's murder. They offered three theories to support
               admission of the evidence: to rehabilitate Flores, to prove the
6              predicate crimes under the section 186.22 gang enhancement, and
               to establish intent under Evidence Code section 1101, subdivision
7              (b). The court ruled that four robberies which occurred in October
               2002 were admissible for purposes of section 186.22, but
8              postponed its ruling on whether the evidence was admissible under
               Evidence Code section 1101, subdivision (b). The court
9              subsequently ruled that evidence of the four robberies was not
               cumulative, since it was already admitted under section 186.22,
10             and was therefore admissible to show intent under Evidence Code
               section 1101, subdivision (b).

11
               Defendants argue that they are entitled to reversal because the court
12             erred in admitting Flores's testimony regarding defendants'
               participation in the four October 2002 robberies. They contend
13             that: (1) the evidence was inadmissible under Evidence Code
               section 1101, subdivision (b) to show intent; (2) it was error to
14             admit the evidence under Evidence Code section 352, even if the
               evidence was relevant to the section 186.22 issues; and (3) the
15             court violated their due process right to a fair trial.

16             We review the admission of other crimes evidence for abuse of
               discretion, because it is "essentially a determination of relevance."
17             (People v. Kipp (1998) 18 Cal.4th 349, 369.) We conclude there
               was no abuse of discretion in this case. Finding no abuse of
18             discretion, we also reject defendants' due process claim.

19             Defendants concede that evidence of the four robberies was
               relevant to establish the predicate offences under section 186.22,
20             but argue there was too much of it. Specifically, defendants
               contend that the court abused its discretion under Evidence Code
21             section 352 by admitting four offenses when only "two or more"
               were required to establish a "pattern of criminal gang activity"
22             under section 186.22. They also maintain that the prejudicial
               impact of the evidence outweighed its probative value.

23
               We conclude that the court acted within its discretion to select the
24             four of six proffered offenses. It selected the offenses that occurred
               closest in time to the murder and involved both Barragan and
25             Gonzales. The evidence of defendants' involvement in four
               robberies within a week's time was relevant to establish a "pattern
26             of criminal gang activity" under section 186.22. Nothing in the

                                          23

content or manner of Flores's brief testimony regarding the robberies evoked "an emotional bias against a party as an individual." (People v. Crittenden (1994) 9 Cal.4th 83, 134.)  And as we explained, defendants concede the probative value of the testimony.  (Ibid.)

We also reject defendants' argument that the court abused its discretion in admitting evidence of the four robberies to show intent under Evidence Code section 1101, subdivision (b). FN7 Defendants assert that intent was not in dispute and the proffered evidence did not meet the more stringent conditions for admission to show identity. (See People v. Ewoldt (1994) 7 Cal.4th 380, 403 [the greatest degree of similarity is required for evidence of uncharged misconduct to be admitted to prove identity].) Defendants maintain that the evidence was inadmissible for any purpose under Evidence Code section 1101, subdivision (b), and represented an attempt by the prosecution to show defendants were guilty of the charged crimes because they had a history of violence.

> FN7. Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The court did not abuse its discretion in ruling that the evidence was admissible to show intent under Evidence Code section 1101, subdivision (b). Although Flores testified about the planning that took place in advance of the attempted home invasion robbery and murder, we agree with the prosecution that details of the robberies were relevant to the prosecution theory that the home invasion robbery was part of defendants' fall 2002 crime spree. In each of the four robberies, defendants used masks, gloves, handguns, and, in three, tried to access a safe. Moreover, while the court may have been incorrect in its characterization of the evidence as not being cumulative, it was already properly before the jury for purposes of establishing the predicate offenses under section 186.22. Thus, its admission was not prejudicial.

We, therefore, reject defendants' argument that admission of evidence of the four robberies was fundamentally unfair and therefore violated their right of due process. Defendants are correct that "[t]he aim of the requirement of due process is ... to prevent fundamental unfairness in the use of evidence, whether true or

24

false." (Lisenba v. California (1941) 314 U.S. 219, 236.) Given the relevance of the evidence of the four robberies, neither of the court's rulings created "impermissible inferences, without foundation in reason or experience" or "'undermine[d] the factfinder's responsibility at trial,'" as suggested by defendants.

(Dkt. No. 1, at 103-106.)

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920.

The undersigned has reviewed Flores' testimony regarding the robberies. (RT, Volume 11 of 18, at 3262-71.) Although intent was not a strongly disputed issue, admission of this evidence for purposes of establishing intent did not violate fundamental fairness. In addition, admission of evidence of these four prior robberies to establish predicate offenses under California Penal Code § 186.22 was not fundamentally unfair.

For the reasons discussed above, the undersigned finds that the denial of this claim by the California Court of Appeal did not violate clearly established Supreme Court authority. Accordingly, this claim should be denied.

D. Alleged Jury Instruction Error

Petitioner argues that the jury instructions regarding accomplice testimony were improper. The California Court of Appeal denied this claim for the reasons stated herein:

////

The court instructed the jury that witnesses Flores and Herrera were accomplices as a matter of law. Based on the understanding that accomplice testimony is inherently untrustworthy, section 1111 requires corroboration of accomplice testimony "by such other evidence as shall tend to connect the defendant with the commission of the offense." FN13 ( People v. Belton (1979) 23 Cal.3d 516, 520, fn. 3.) However, People v. Maldonado (1999) 72 Cal.App.4th 588, 597-598 (Maldonado) holds that accomplice corroboration was [sic] is [not] required to prove a gun use enhancement.

> FN13. Section 1111 reads in its entirety: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The court in this case instructed the jury on accomplice corroboration with CALJIC No. 311 (July 2004), FN14, then read the following special instruction to the jury: "This [accomplice corroboration] rule does not apply to the Intentional Discharge of a Firearm allegation, the Gang-Related Crime allegation, or the predicate offenses which must be proved in the Gang-Related Crime allegation. [¶] *This rule does not apply to crimes ... that I will instruct you that may be considered as tending to show the existence of an intent which is a necessary element of crimes charged. These crimes include the alleged robberies at the Motel 6 in Modesto, Stop 'N Sav in Modesto, Denny's in Lathrop, and the Quik Stop in Ripon.*" (Italics added.)

> FN14. The modified version of CALJIC NO. 311 read: "You cannot find the defendants guilty of the crimes in Counts 1 through 3 or the special circumstances allegations based upon the testimony of an accomplice, unless that evidence is corroborated by other evidence which tends to connect the defendant with the commission of that offense.... [¶] Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated out of court was true."

On appeal, Barragan contends that the court erred in giving the special instruction because "the 'predicate offenses' listed in the instructions also constituted evidence on which the defendants'

26

guilt of the charged offense could be predicated." Specifically, he argues that "[t]he problems were that the other four robberies of which the jury was to learn were going to be considered to establish Mr. Barragan's involvement as a robber of the McDougall [sic] household, regardless of any limiting instruction given, and that-accordingly-Mr. Barragan's guilt of the other robberies could not logically be segregated from the issue of his guilt of the McDougall [sic] crimes." He maintains, in an argument we already rejected, that the jury was allowed to consider evidence of the four robberies to establish the identity of the robbers. FN15 Barragan contends that as a practical matter, the error in the special instruction effectively eliminated the corroboration requirement as to all of Flores's testimony. There is no merit in Barragan's contention.

> FN15. See discussion at pages 55-56, ante.

Barragan does not argue that the court erred in relying on Maldonado as an exception to the corroboration requirement. Instead, the gist of Barragan's argument is that the court's limiting instruction was ineffective, FN16, and the jury improperly considered evidence of the uncharged robberies to prove that Barragan robbed the MacDougall household. We conclude that the special instruction was a correct statement of the law and, when read together with the court's limiting instruction, properly instructed the jury on how it should consider Flores's testimony regarding the uncharged offenses. The special instruction clearly identified the testimony not subject to the corroboration requirement. Moreover, there is no evidence to suggest that the jury misapplied the instruction. We therefore presume that the jurors understood and followed the instructions as read. (People v. Smith, supra, 40 Cal.4th at pp. 517-518.)

> FN16. The court read the following limiting instruction regarding evidence of the four uncharged robberies: "Evidence has been introduced for the purpose of showing that the defendants committed crimes other than that for which they are on trial, namely an alleged robbery of a Motel 6 in Modesto, a Stop 'N Sav in Modesto, a Quik Stop in Ripon, and a Denny's Restaurant in Lathrop. [¶] Except as you will be otherwise instructed, this evidence, if believed, may not be considered by you to prove that a defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you for the limited purpose of determining if it tends to show the existence of the intent, which is a necessary element of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you may weigh it in the same manner as you do all other evidence in the

27

1
2
3

       case. [¶] You must not consider this evidence
against either defendant for the purpose of showing
intent, unless you find that by a preponderance of
the evidence that such defendant committed the
other crimes."

4   (Dkt. No. 1, at 125-28.)

5          A challenge to jury instructions does not generally state a federal constitutional

6   claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

7   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

8   interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

9   Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

10   (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

11   a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

12   Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

13   level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

14   73. The Supreme Court has defined the category of infractions that violate fundamental fairness

15   very narrowly.  Id.

16          As noted by the California Court of Appeal, petitioner does not dispute that under

17   California law, accomplice corroboration is not required to prove a gun use enhancement.  Nor

18   does petitioner appear to dispute that the accomplice corroboration law does not apply to

19   uncharged acts admitted pursuant to Cal. Penal Code § 1101(b).  Petitioner argues that the

20   special instruction setting forth these exceptions to the accomplice corroboration rule effectively

21   eliminated the corroboration requirement as to all of Flores's testimony.

22          The undersigned agrees with the reasoning of the California Court of Appeal in

23   rejecting this claim.  As discussed above, the California Court of Appeal found that the special

24   instruction correctly stated the law and properly instructed the jury as to how to consider Flores's

25   testimony regarding the uncharged robberies.  This instruction clearly identified the portion of

26   Flores's testimony that was not subject to the corroboration requirement.  The challenged

1    instruction did not violate fundamental fairness.

2         The denial of this claim by the California Court of Appeal was not an

3    unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

4    should be denied.

5    V.   Conclusion

6         For all of the above reasons, IT IS HEREBY RECOMMENDED that petitioner's

7    application for a writ of habeas corpus be denied.

8         These findings and recommendations are submitted to the United States District

9    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

10   one days after being served with these findings and recommendations, any party may file written

11   objections with the court and serve a copy on all parties.  Such a document should be captioned

12   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

13   objections, he shall also address whether a certificate of appealability should issue and, if so, why

14   and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

15   the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

16   2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

17   service of the objections.  The parties are advised that failure to file objections within the

18   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

19   F.2d 1153 (9th Cir. 1991).

20   DATED:  April 12, 2011

21

22                                    _____
                                      KENDALL J. NEWMAN

23                                    UNITED STATES MAGISTRATE JUDGE

24   bar2584.157

25

26